**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| NORMA J. LUTZ, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 10-1268 |
| v. | ) | |
| | ) | Judge Nora Barry Fischer |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant | ) | |


## <u>MEMORANDUM OPINION</u>


### I.    INTRODUCTION

Norma J. Lutz ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 7, 11). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB with the Social Security Administration June 19, 2007, claiming an inability to work due to disability as of April 4, 1994. (R. at 13)[1].  The date on which Plaintiff was last insured for DIB purposes was March 31, 2000. (R. at 87).  Plaintiff was initially denied benefits on September 18, 2007. (R. at 110 – 14).  A hearing was scheduled for June 11, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 85).  A vocational expert, Karen Kroll, also testified. (R. at 85).  The Administrative Law Judge ("ALJ") , William E. Kenworthy, issued his decision denying benefits to Plaintiff on September 3, 2009. (R. at 10 - 18).  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on July 29, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 4).

Plaintiff filed her Complaint in this court on September 27, 2010. (ECF No. 1).  Defendant filed his Answer on November 29, 2010. (ECF No. 2).  Cross motions for summary judgment followed.

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born November 2, 1961, and was forty seven years of age at the time of her administrative hearing. (R. at 279).  Plaintiff completed tenth grade, but advanced no further. (R. at 91).  Plaintiff went back to school and received her diploma in 2004 or 2005. (R. at 91 – 92).  Plaintiff has no post-secondary education. (R. at 92).  Plaintiff is married and has three children, including two step-children. (R. at 90, 484).   Plaintiff's relationship with her husband was

---

[1] Citations to ECF Nos. 3 – 3-9, the Record, *hereinafter*, "R. at __."

strained during the relevant time period, and was often a source of stress. (R. at 435). She worked at K-mart, and injured her left foot while there. (R. at 437, 484). Plaintiff has not been employed since her injury, though she was reportedly attempting to start her own business in early 1997. (R. at 393, 438, 601). In late 1998, Plaintiff stopped receiving worker's compensation from K-mart after a company doctor concluded that Plaintiff was capable of returning to work, though she later regained it following a decision by the Worker's Compensation Appeal Board in 2001. (R. at 150 – 60, 162 – 67, 595). Plaintiff received a monetary settlement from K-mart in 2008. (R. at 143 – 46).

B. <u>Medical History</u>

On April 4, 1994, while employed as a clerk, Plaintiff stepped on a piece of "bad" plywood flooring while carrying a box, twisted her foot, and experienced sudden pain. (R. at 437, 445). She worked through the remainder of the day, but the following day sought treatment at the emergency room because of significant discomfort and swelling. (R. at 437). Medical imaging revealed no abnormality. (R. at 437, 445). Plaintiff was diagnosed with severe sprain of her Lisfranc's joint. (R. at 445).

A cast was placed on Plaintiff's foot on April 6 after being examined by Michael W. Bowman, M.D., but thereafter, Plaintiff's pain only increased. (R. at 437, 445 – 46). Plaintiff later fell, causing her to land on her left foot – worsening her pain. (R. at 444). Dr. Bowman removed and reapplied a cast on Plaintiff's left foot on April 28, 1994. (R. at 444). At her examinations with Dr. Bowman on April 6 and 28, Plaintiff was considered capable of sedentary work duty, but would require the use of crutches to ambulate. (R. at 444).

Plaintiff subsequently fell on her left knee while wearing the new cast, exacerbating her pain. (R. at 437, 443). The cast was removed by Dr. Bowman on May 18, 1994, and Plaintiff's

left foot was placed in a splint. (R. at 443). Visual inspection showed no knee effusion or instability, but Plaintiff's left foot was mottled, cool, swollen, and diffusely tender. (R. at 443). Plaintiff was observed to be capable of sedentary work, but could not endure weight bearing on her left leg, and required the use of crutches to ambulate. (R. at 443).

A bone scan was performed on Plaintiff's left foot which revealed the presence of reflex sympathetic dystrophy ("RSD").[2] (R. at 437). In response to the finding, Dr. Bowman recommended treatment in the form of lumbar sympathetic blocks, anti-inflammatories, and aggressive therapy to mobilize Plaintiff's foot, improve her strength, and increase her weight-bearing endurance. (R. at 442). Plaintiff was found to be capable of sedentary work. (R. at 442).

Following her injury, Plaintiff began visiting Ronald L. Zimmerman, M.D. for further treatment of her left foot in June of 1994. (R. at 439). Dr. Zimmerman concurred with Dr. Bowman in finding that based upon blood flow imaging of Plaintiff's feet in May of 1994, Plaintiff suffered early soft tissue RSD in her left foot and calf. (R. at 437 – 39, 447). Dr. Zimmerman began a regimen of prescription medications for treatment, and ordered a course of physical therapy. (R. at 437 – 39). The record shows that Plaintiff began attending physical therapy at Passavant Hospital in June of 1994. (R. at 484). Initially, Plaintiff was unable to bear weight, was hypersensitive, and could not ambulate without crutches. (R. at 484). Plaintiff was noted to be slightly obese. (R. at 485).

Over the course of her therapy at Passavant, Plaintiff made steady, positive progress. (R. at 412, 416 - 19, 426, 429, 433, 440, 486 – 96). Plaintiff had the greatest difficulty tolerating

---

[2]     RSD, also referred to as, "complex regional pain syndrome," is a "chronic pain condition that can affect any area of the body, but often affects an arm or a leg." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmed health/PMH0004456/ (last visited April 4, 2011). There is no certain etiology for RDS, though it is believed to result from damage to the nervous system, inhibiting the proper regulation of blood flow, sensation, and temperature in the affected area of the body. *Id.* The immune system may also be involved, given the presence of inflammatory symptoms such as redness, warmth, and swelling in the affected area of the body. *Id.*

weight bearing, however this continually improved. (R. at 412, 416 - 19, 426, 429, 433, 440, 486 – 96). Plaintiff responded well to her therapy, and reported that it made her feel more normal. (R. at 412, 416 - 19, 426, 429, 433, 440, 486 – 96). She also slowly reduced her reliance on crutches to ambulate, and eventually was able to walk up to 500 feet at a time with the aid of a cane. (R. at 412, 416 - 19, 426, 429, 433, 440, 486 – 96). In addition to physical therapy, Plaintiff noted that arch supports for her left foot significantly reduced her pain. (R. at 493). She reported being able to ambulate at home without the use of a cane – reserving the use of the cane to outside the home. (R. at 411). Yet by the end of her therapy at Passavant, Plaintiff continued to experience difficulty walking on uneven surfaces and stairs. (R. at 409).

It was noted by Dr. Zimmerman that as early as June 10, 1994, Plaintiff was making good progress, and had, "turned a corner," with respect to her RSD. (R. at 435, 504). Dr. Zimmerman noted progress in Plaintiff's condition similar to the findings made in the treatment notes from Passavant Hospital. (R. at 400 – 06, 414 – 15, 420 – 25, 427 – 28, 431 – 32, 434 – 36). Plaintiff was ambulating up to six hours a day with just a cane, and Dr. Zimmerman believed that upticks in Plaintiff's pain were the result of increases in activity and her voluntary decrease in use of pain medication. (R. at 420 – 23).

In November of 1995, Plaintiff began seeing Petra S. Nour, M.D. for continued treatment of her RSD. (R. at 373 – 75). Plaintiff had maintained a regular schedule of physical therapy since her injury. (R. at 373 – 75). Her condition had improved further with the initiation of Neurontin[3] therapy in July of 1995. (R. at 373 – 75). Despite this success, Plaintiff complained that she still suffered persistent throbbing pain and intermittent sharp pain in her left foot. (R. at

---

[3] Neurontin, also known as, "Gabapentin," is utilized to aid in controlling seizures, and to relieve pain associated with postherpetic neuralgia (burning, stabbing pain or aches that may last for months or years after an attack of shingles) by altering the way the body senses pain. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmed health/PMH0000940/ (last visited April 4, 2011).

373 – 75).  Dr. Nour administered lumbar epidural sympathetic blocks at Ellwood City Hospital to treat Plaintiff's pain in November of 1995. (R. at 370, 379, 380).  The successive procedures gradually reduced Plaintiff's pain to a score of four on a pain scale of ten. (R. at 370, 379, 380).

Plaintiff was referred to Karen R. Rendt, M.D. by Dr. Zimmerman and Michael Wusylko, M.D. for treatment of her RSD. (R. at 391).  The record shows that Plaintiff began visiting Dr. Rendt in March of 1995. (R. at 391).  At this initial examination, Plaintiff was still engaging in physical therapy once per week. (R. at 391).  Plaintiff claimed she had experienced only gradual and incomplete improvement through physical therapy. (R. at 392).  Her left foot was still painful and continued to swell on a daily basis – more so when she was on her feet. (R. at 392).  At the time she was taking Salicylate,[4] to which she attributed significant relief of her RSD symptoms. (R. at 392).  Dr. Rendt noted that Plaintiff's knees, hips, ankles, and right foot were unremarkable and exhibited a good range of motion. (R. at 394).  Tenderness in Plaintiff's left foot was, however, palpable. (R. at 394).

While under Dr. Rendt's care, Plaintiff initially continued with her medications and physical therapy, as before. (R. at 390 – 94).  In light of the lack of an available desk job for Plaintiff at K-mart, she was determined to be unable to return to work during this period. (R. at 390).  Her left foot typically exhibited varying degrees of sensitivity, but she was improving steadily until June of 1995. (R. at 388 – 90).  Plaintiff claimed at that time that the physical therapy was not improving her functionality, and was even worsening her RSD symptoms. (R. at 388).  The following month, however, she reported a greater weight-bearing tolerance, the ability

---

[4]     Salicylates are a major ingredient of aspirin and other pain-relieving medications. WebMD, http://www.webmd.com/allergies/guide/salicylate-allergy (last visited April 4, 2011).

to walk more frequently without a cane, and significant pain relief from the use of a TENS unit[5] at her home. (R. at 368).  Plaintiff was also compliant with her medication regimen. (R. at 368). By October of 1995, Plaintiff reported, "miraculous," relief from her RSD symptoms as the result of recent Gabapentin therapy. (R. at 385).  That, in conjunction with her use of Neurontin, had greatly improved Plaintiff's symptoms. (R. at 385).

By December of 1995, Plaintiff again complained that physical therapy was making her RSD symptoms worse, and she did not wish to continue with lumbar injections for relief of her pain because of alleged side-effects, and in spite of observed relief. (R. at 384).  Dr. Rendt expressed frustration with Plaintiff's continued symptomology, and felt she had exhausted most therapeutic options. (R. at 384).  A dorsal column stimulator ("DCS")[6] implantation appeared to be the next best option for treatment. (R. at 547).  Plaintiff discontinued physical therapy and relied upon Tylenol for relief of her RSD symptoms. (R. at 547 – 48).

The record indicates that Plaintiff began visiting the Cleveland Clinic in January of 1996 for treatment of RSD in her left foot. (R. at 518).  Plaintiff complained that she experienced pain and swelling that would extend to her left knee despite a course of aggressive physical therapy. (R. at 512, 518).  She rated her discomfort as ten out of a pain scale of ten. (R. at 518).  Her pain increased in response to pressure on her left foot. (R. at 519).

Medical notes from the Cleveland Clinic show that Plaintiff had been compliant with prior physical therapy modalities, and had been engaging in progressive weight bearing, though Plaintiff would experience severe pain with weight bearing beyond two hours. (R. at 512).

---

[5]     A TENS (transcutaneous electrical nerve stimulation) unit utilizes low-voltage electrical current for pain relief, and is applied to the skin above the area of pain using two electrodes. WebMD, http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nerve-stimulation-tens-topic-overview (last visited April 4, 2011).

[6]     A DCS, also referred to as a, "spinal cord stimulator," is a surgically implanted device for application of mild electrical current directly to the spinal cord, interrupting pain signals to the brain. Mayfield Clinic, http://www.mayfieldclinic.com/PE-STIM.htm (last visited April 4, 2011).

Plaintiff was also having difficulty sleeping because of her pain. (R. at 512). She indicated that she could not return to her former employment at K-mart because there was no work she could perform at the store while using her cane. (R. at 512). Medical imaging and scans were consistent with deranged blood flow in the left foot, and osteoporosis of the left foot and ankle bones, caused by RSD. (R. at 513).

Plaintiff returned to the Cleveland Clinic on April 24, 1996 for a trial implantation of a DCS for her left foot pain. (R. at 459 – 60, 520 – 21). At a follow-up appointment on May 3, 1996, Plaintiff was getting good coverage in her left foot from the DCS. (R. at 522). She reported to Dr. Rendt that there was a distinct improvement in pain, and complete relief from the normal associated stiffness. (R. at 544). Plaintiff claimed that she could walk more normally. (R. at 544). On May 28, a permanent DCS was then implanted. (R. at 523, 574, 579). Yet, Plaintiff complained of general discomfort, foot pain, and headache at a follow-up visit on June 7, 1996. (R. at 523).

Conversely, in September of 1996, Dr. Rendt reported that Plaintiff experienced definite improvement in her RSD symptoms. (R. at 542). The DCS was found to provide true relief. (R. at 543). By May of 1997, Plaintiff had improved to the point that she was in the beginning stages of starting her own business. (R. at 540). Dr. Rendt noted that Plaintiff had spent a substantial amount of time working on a building her business was intended to occupy. (R. at 540). Plaintiff reported that she had been feeling, "really good all over." (R. at 540). Unfortunately, a bone scan that same month did reveal evidence of RSD in Plaintiff's right foot. (R. at 525, 538). However, Plaintiff proceeded to take a trip to Disney World with her daughter and nephew in July of 1997. (R. at 538). In December of 1997, Plaintiff stated that her RSD seemed to be settling down, and that she would like to rely as little as possible on pain

medication in light of her improvement. (R. at 537). Dr. Rendt determined that Plaintiff's RSD was fairly stable. (R. at 537).

In May of 1998, Plaintiff suffered a significant flare-up of her RSD symptoms, largely attributable to the failure of her DCS unit. (R. at 525, 535). In September of 1998, it was recommended that Plaintiff have the DCS unit replaced, and that electrodes be extended to provide relief to Plaintiff's right and left legs. (R. at 525, 533). However, due to an ensuing disagreement with K-mart regarding whether worker's compensation should cover replacement of the DCS unit or its battery, Plaintiff was unable to pay for the necessary procedure. (R. at 529). Dr. Rendt opined that in her current condition, Plaintiff was incapable of returning to her former position as a clerk at K-mart. (R. at 529).

In March of 1999, Dr. Zimmerman re-evaluated Plaintiff for Dr. Rendt, and found Plaintiff to be capable of walking up to one block, shopping up to twice a week, and washing clothes. (R. at 395). Plaintiff's RSD symptoms continued to be active through September of 1999, although Plaintiff's primary care physician, Dr. Wusylko, noted that Plaintiff had ceased taking her prescription Daypro[7] and Neurontin for her RSD pain in March of 1999. (R. at 531 – 32, 586 – 88, 594). Her complaints regarding her RSD pain had also reportedly decreased. (R. at 594).

In January of 2000, the medical record indicates that Plaintiff was denied her worker's compensation claim regarding her DCS unit. (R. at 584). Her RSD continued, in both feet, but she remained active and was seeking to join an aquatic exercise program despite this setback. (R. at 584). In April of 2000, though, Plaintiff was finally approved for replacement of her DCS unit. (R. at 582). The lack of a functioning DCS unit had left Plaintiff complaining of difficulty

---

[7] Daypro, also known as, "Oxaprozin," is a non-steroidal anti-inflammatory medication used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000919/ (last visited April 4, 2011).

sleeping due to pain, significant fatigue, and an inability to engage in exercise. (R. at 582). Yet even when the DCS unit was not working properly, Plaintiff's RSD was considered to be relatively well controlled. (R. at 583).

A DCS was again implanted into Plaintiff at the Cleveland Clinic. (R. at 556). At that time she had been diagnosed as having RSD in both feet and was walking with a cane. (R. at 556 – 57, 559). The old DCS was simultaneously removed on May 1, 2000. (R. at 452 – 53, 462, 557, 559). By September of 2000, following the replacement surgery, Plaintiff experienced, "good relief," her RSD symptoms were improving, and "overall she is doing well with [physical therapy]." (R. at 454). Her pain score was between four and five on a scale of ten. (R. at 552). The DCS was also reprogrammed at that time to provide more uniform coverage of Plaintiff's legs. (R. at 552).

C. Functional Capacity

An independent medical evaluation of Plaintiff's RSD related limitations was completed by Paul S. Lieber, M.D. on April 24, 1995, for Plaintiff's worker's compensation claims. (R. at 360 – 64). Dr. Lieber concluded that Plaintiff's symptoms were consistent with RSD, although at that time Plaintiff reported an eighty percent improvement in her RSD symptoms. (R. at 362 – 63). Dr. Lieber found that Plaintiff experienced generalized pain over her left foot, some swelling, and pain rated as four on a scale of ten. (R. at 362). Plaintiff was observed to have made good progress in treatment, and Dr. Lieber felt she would fully recover from her RSD. (R. at 363). Plaintiff's subjective complaints at the time were fully corroborated by objective physical findings. (R. at 363). As a result of her RSD, Dr. Lieber concluded that Plaintiff had the capacity for full-time sedentary work, because she would do well as long as her activities were completed while sitting. (R. at 363).

Michael R. Zernich, M.D. completed an independent medical evaluation of Plaintiff's RSD related limitations on April 1, 1998. (R. at 349 – 53). Dr. Zernich felt that Plaintiff was unlikely to fully recover from her RSD symptomology. (R. at 352). He opined that hypersensitivity caused Plaintiff's body to respond dramatically to minor insults. (R. at 352). However, an independent medical evaluation by Stephen R. Bailey, M.D. in October of 1998 described Plaintiff as having been misdiagnosed with RSD. (R. at 354 – 58). Plaintiff was largely asymptomatic, and had fully recovered from her actual injury – mild sprain of the left foot. (R. at 354 – 58). Plaintiff was determined to be capable of returning to full-time work in her prior position at K-mart as a clerk/ stockperson. (R. at 358). Plaintiff would have no functional limitations. (R. at 358).

On July 8, 1999, Michael Stanton-Hicks, M.D. was deposed regarding Plaintiff's RSD as it pertained to her worker's compensation claim. (R. at 206). At the deposition, Dr. Stanton-Hicks testified that Plaintiff did not have the functional capacity to return to her former employment as a stockperson/ clerk at K-mart. (R. at 235). Dr. Stanton-Hicks further explained that Plaintiff was not capable of walking around or standing on her feet for any length of time. (R. at 235). She was incapable of carrying things. (R. at 235). Plaintiff would likely be able to maintain sedentary employment, with limitations to accommodate her RSD related pain. (R. at 235 – 36).

In another worker's compensation related deposition, Dr. Rendt testified in June of 1999 that Plaintiff would be unable to resume her former position as a stockperson/ clerk. (R. at 256 – 71). Plaintiff's RSD made ambulation too difficult. (R. at 271). Likewise, Dr. Zimmerman concluded in an evaluation in January of 2005 that Plaintiff was no longer capable of returning to her former job at K-mart. (R. at 404). She was capable of part-time sedentary work, as long as

such work required no more than one hour standing or walking out of a four hour work day. (R. at 404). Still, Dr. Zimmerman advised Plaintiff that she should try to be as active as possible, up to the limit of her discomfort tolerance. (R. at 401).

On September 17, 2007, Juan B. Mari-Mayans, M.D. completed a physical residual functional capacity ("RSD") assessment of Plaintiff. (R. at 467). Dr. Mari-Mayans concluded after reviewing Plaintiff's medical files that Plaintiff was functionally limited in the following respects: Plaintiff could occasionally lift ten pounds; Plaintiff could frequently lift only significantly less than ten pounds; Plaintiff could stand and/ or walk at least two hours of a six hour workday; Plaintiff could sit approximately six hours; Plaintiff was limited in pushing or pulling with her lower extremities; and, Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (R. at 465 – 69). Plaintiff's complaints of pain were found only partially credible. (R. at 469).

D. <u>Administrative Hearing</u>

At her hearing, Plaintiff testified that her former job at K-mart entailed loading and unloading boxes of inventory in K-mart, stocking shelves, and shifting inventory around for different seasons. (R. at 90). Plaintiff was frequently required to use stairs to fulfill her job duties. (R. at 90). It was while carrying one of these boxes that Plaintiff stepped on an unstable piece of flooring and injured herself. (R. at 91). Plaintiff had not worked in any capacity since that time. (R. at 91).

Plaintiff claimed that from the day of her injury through her last insured date of March 31, 2000, her RSD caused debilitating, uncontrollable pain that left her foot swollen and discolored, and prevented her from carrying on normal activities and sleeping. (R. at 92). The ALJ inquired of Plaintiff why she had waited until 2007 to file her claim for DIB, in light of her

longstanding RSD related ailments. (R. at 96). Plaintiff replied that her former attorney did not provide her with ample guidance with respect to her disability options. (R. at 96).

Regarding Plaintiff's DCS unit, she testified that it provided her with significant relief and kept her RSD pain in check. (R. at 98). However, her first permanent DCS unit fell out of place and did not provide the full amount of relief expected. (R. at 102). This unit also caused Plaintiff to suffer spinal headaches. (R. at 102). Plaintiff explained that she had taken multiple types of pain medications for her RSD pain, as well as back pain. (R. at 98 – 99). She felt that these medications provided minimal relief. (R. at 99). Most days, Plaintiff kept her foot elevated – at least five times a day – to help alleviate pain and swelling. (R. at 100). She would do this intermittently for thirty minutes to an hour. (R. at 100). Plaintiff would also often lie down and elevate her legs above the level of her heart. (R. at 100).

Plaintiff felt that the RSD had torn her life apart. (R. at 101). Plaintiff was forced to give up a substantial number of activities, many of which – including bike riding and playing badminton – were activities she wished she could share with her daughter. (R. at 101). She lamented most the time lost with her daughter. (R. at 101).

Following Plaintiff's testimony, the ALJ asked the vocational expert what jobs would be available to a hypothetical person of Plaintiff's age, education, and work experience, with the following limitations: sedentary exertional level, only, with a sit stand option; no exposure to heights or other hazards; and, no work requiring concentration upon detailed or complex tasks. (R. at 105).

The vocational expert stated that such a person would have a number of potential occupations, including, "alarm monitor or surveillance system operator," with 81,000 positions

available in the national economy, "ticket checker," with 77,000 positions available, and "telemarketer," with 350,000 positions available. (R. at 106).

The ALJ then asked whether jobs would be available in significant numbers in the national economy for the hypothetical person, if such person also would need to elevate his or her leg to hip level for a substantial portion of the work day. (R. at 106). The vocational expert replied by saying that no jobs would be available to such a person. (R. at 106).


## IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[8] and 1383(c)(3)[9]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706.  When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact.  *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.  *Ventura v.*

---

[8]    Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[9]    Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).  If the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947).  In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis.  *Chenery*, 332 U.S. at 196 – 97.  Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).  The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of

impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## V. DISCUSSION

The ALJ concluded that Plaintiff had a medically determinable severe impairment in the way of complex regional pain syndrome (RSD) of the left ankle and foot. (R. at 15). Plaintiff was determined not to be disabled because she had the functional capacity to perform a full range of sedentary work, and – consistent with the testimony of the vocational expert – she therefore qualified for a significant number of jobs in existence in the national economy. (R. at 16).

Plaintiff objects to her unfavorable determination on several points. First, Plaintiff claims that the Appeals Council erred in failing to reverse the decision of the ALJ in light of newly presented evidence. Plaintiff's contention, however, is not supported. With respect to new evidence, a claimant may submit said evidence to the Appeals Council for consideration so long as it is material to the period of alleged disability on or before the date of the ALJ's hearing. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001); 20 C.F.R. § 404.970(b). If the new

evidence meets the requirements for review, the Appeals Council must evaluate the new evidence with the prior evidence on record as a whole to determine if the ALJ's decision was supported by substantial evidence. *Id.* However, the Appeals Council may decline review if the ALJ's decision is not at odds with the weight of the evidence on record. *Id.*

Where the Appeals Council denies review, the ALJ's determination is conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Matthews*, 239 F.3d at 594-95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supports an ALJ's determination. *Id.*

A district court is not bound by regulation when reviewing an ALJ's decision, but is instead bound by the Act. 42 U.S.C. § 405(g) states that a "court shall have power to enter, upon *the pleadings and transcript of record*, a judgment affirming, modifying, or reversing a decision of the Commissioner." *Matthews*, 239 F.3d at 594 (citing *Jones v. Sullivan*, 954 F.2d 125, 128 (3d. Cir. 1991) ("Because . . . evidence was not before the ALJ, it cannot be used to argue that the ALJ's decision was not supported by 'substantial evidence.'")). A district court will not, therefore, directly consider new evidence, but instead remand for consideration "by the forum which is entrusted by the statutory scheme for determining disability *vel non*." *Matthews*, 239 F.3d at 594.

In order to remand, however, a claimant must make an appropriate request. *Matthews*, 239 F.3d at 592. The claimant needs to satisfy three requirements. *Id.* at 594. First, new evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record. *Szuback v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984).

Second, new evidence must also be "material," in that it is relevant to the time period and physical impairment(s) under consideration, it is probative, and it is reasonably possible that such evidence would have changed the ALJ's decision if presented earlier. *Id*. Third, "good cause" must be shown for not submitting the evidence at an earlier time. *Id*. The court demands these three showings be made to avoid inviting claimants to withhold evidence in order to obtain another "bite of the apple" when the Commissioner denies benefits. *Matthews*, 239 F.3d at 595 (citing *Szubak*, 745 F.2d at 834). The court wishes to promote the presentation of all material evidence before the ALJ, as soon as possible. *Id*. at 594-95.

Plaintiff has failed to adequately justify a remand in accordance with the requirements of *Szuback*, 745 F.2d at 833. Plaintiff lists the requirements for a proper showing, but fails to do more than summarily state that her new evidence meets these requirements. While much of the evidence is clearly from the relevant time period, Plaintiff fails to explain or provide examples of how the new evidence is probative, and further, how its inclusion would have potentially altered the ultimate determination of the ALJ. Moreover, considering that much of this evidence was recorded by the same doctors and institutions at the same time as the evidence already on record, Plaintiff fails to explain how the new evidence would not be cumulative. As a result, there is no justification for remanding the case to the ALJ for reconsideration within the context of Plaintiff's new evidence.

Plaintiff next argues that the denial of DIB was in error because the ALJ failed to account for medically established functional limitations created by an implanted dorsal column stimulator, failed to account for medically established functional limitations created by swelling of Plaintiff's feet, and failed to account for functional limitations created by Plaintiff's back pain,

as described by Plaintiff during her administrative hearing. In the present case, however, the ALJ properly followed the disability determination protocol.

With respect to limitations attributable to implantation of the DCS unit, Plaintiff – despite citing numerous sections of the record – fails to illustrate a single functional limitation directly resulting from Plaintiff's use of a DCS unit. (ECF No. 9 at 4 – 6). More specifically, Plaintiff fails to provide an example of a DCS related functional limitation that would preclude Plaintiff from engaging in sedentary work. (ECF No. 9 at 4 – 6). Similarly, Plaintiff fails to give the court an example of a limitation which would preclude Plaintiff from engaging in sedentary work on a full-time basis, and is attributable to the swelling in her feet. (ECF No. 9 at 6 – 7). It is notable that neither the swelling in Plaintiff's feet nor the DCS unit in her back stopped her from preparing to open a business, or from going on vacation. (R. at 538, 540).

In terms of Plaintiff's alleged need to lie down and elevate her feet frequently throughout the day, the ALJ is correct in his assertion that nowhere in the record does Plaintiff complain of such a need to a treating medical professional, and nowhere in the record does one of Plaintiff's treating medical professionals recommend such treatment. (R. at 16). There are multiple occasions, however, where medical professionals attest to Plaintiff's ability to perform sedentary work, in contrast to her former position, and Plaintiff herself stated that she could have returned to K-mart if a desk job had been available. (R. at 235 – 36, 363, 390, 404, 442 – 44, 512).

Here, the ALJ properly discussed all of claimant's credibly established impairments and resultant limitations, and Plaintiff has provided no evidence which specifically indicates otherwise. As such, Plaintiff's argument regarding the DCS unit, swelling in her feet, and need to elevate her legs, is unavailing. The ALJ's determination is supported by substantial evidence.

In Plaintiff's final objection to her unfavorable determination, she argues that the ALJ

should not have made a negative inference regarding her credibility based upon her justification for the lengthy delay in filing for DIB, and that such a negative inference is reversible error. However, there is no error here which justifies a reversal or remand. Where a claimant is attacking an agency decision, the burden of showing that an agency error caused harm is on the claimant. *Shinseki v. Sanders*, 129 S. Ct. 1969, 1706 (2009). If the harm caused is not immediately clear, the claimant must explain how the agency's action caused harm. *Id.* At present, Plaintiff's argument with respect to the ALJ's credibility determination fails because there was ample evidence, aside from Plaintiff's reasoning behind the delay in filing for DIB, which the ALJ could have – and did – rely upon in rendering his decision. (R. at 16). *See Gulf Oil Corporation v. Federal Power Commission*, 563 F.2d 588, 603 (3d Cir. 1977) ("[A]n independent and meritorious ground in support of [a] decision renders harmless any error.").

The ALJ questioned the veracity of Plaintiff's subjective complaints because the record did not illustrate an objective need for Plaintiff to elevate her legs during the day, and because objective medical evidence did not describe swelling in Plaintiff's legs which was so severe as to prevent her from engaging in sedentary work. (R. at 16). The ALJ is entitled to make such a credibility determination when testimony is not strongly supported. *Washington v. Barnhart*, 66 Fed. Appx. 290, 292 – 93 (3d Cir. 2003). Further, although the ALJ did consider Plaintiff's testimony about the competence of her prior attorney to attack her credibility, his reliance on the divergence between Plaintiff's subjective complaints and the medical evidence is more than enough to justify his credibility determination. *Jackson v. Barnhart*, 120 Fed. Appx. 904, 907 (3d Cir. 2005). Given the above, the evidence shows, at most, harmless error.

## VI. CONCLUSION

Based upon the foregoing, reversal or remand of the ALJ's decision is not supported. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. An appropriate Order follows.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: April 5, 2011
cc/ecf: All counsel of record.